IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

BREN SIMON,

        Plaintiff,

v.

THE UNITED STATES OF AMERICA,

        Defendant.

## COMPLAINT

This is an action arising under the internal revenue laws of the United States of America for the recovery of gift taxes and interest erroneously and illegally collected from and paid by Plaintiff. Bren Simon hereby brings this action and petitions the Court and alleges as follows:

### I.    PARTIES

1. The Plaintiff is Bren Simon ("Mrs. Simon" or "Plaintiff"). Mrs. Simon is a citizen of the United States of America.

2. The Defendant is the United States of America.

### II.    JURISDICTION AND VENUE

3. Jurisdiction is conferred on this Court by Title 28, United States Code, Section 1346(a)(1) and Title 26, United States Code, Section 7422.

4. Venue is proper in this Court as Mrs. Simon resides in Carbondale, Colorado.

5. Mrs. Simon has complied with all administrative procedures and other precedents to filing this cause of action under 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422(a).

### III.   FACTS

6. In 1983, Plaintiff's husband, Melvin Simon ("**Mel**"), and his brother, Herb Simon ("Herb") purchased the Indiana Pacers, a franchise in the National Basketball Association (the "Pacers").

7. The Pacers were held in Pacers Basketball Corporation, which itself was a wholly owned subsidiary of MH Holdings, Inc. ("MH Holdings")  Mel (through the Mel Simon Trust) and Herb each owned 50% of MH Holdings.

8. Mel did not have a controlling shareholder interest and could not exert unilateral control over either MH Holdings or the Pacers.  Likewise, no ready market existed in which Mel's interest in MH Holdings could be sold.

9. Herb was the Chief Executive Officer of the Pacers and managed its operations.

10. In the early 2000s, the Pacers experienced a financial downturn and began to require significant cash infusions from Mel and Herb.  The genesis of this downturn can be traced to November 19, 2004, when an on-court confrontation in Auburn Hills, Michigan, between Ron Artest of the Pacers and Ben Wallace of the Detroit Pistons escalated into a full scale brawl in the stands between several Pacers players and fans of the Detroit Pistons.

11. Beginning with the "brawl," and continuing with a series of player arrests and other incidents occurring between 2005 and 2008, the Pacers became a civic and family embarrassment and lost significant fan support.

12. These events had a two-fold effect on the Pacers.

13. First, the events impacted the competitive level of the team. Several Pacers players were suspended for a number of games, ranging from one game to the entire season. In subsequent years, the entire roster of the Pacers was overhauled in an effort to put these incidents behind the franchise. The combination of suspensions and roster turmoil torpedoed the team's competitiveness: the 2004-2005 season would be the Pacers' last winning season until the 2011-2012 seasons.

14. Second, these events were a public relations disaster. Enveloped by negative publicity, fans of the team stopped going to the games, buying Pacers merchandise, and supporting the Pacers. The team's losing record exacerbated this downward spiral of fan support. During this timeframe, the Pacers consistently finished at or near the bottom the 30 NBA teams in attendance.

15. The decline in fan support had a devastating impact on the value of Mel's interest in the Pacers. During this period, the team was hemorrhaging cash. Substantial capital contributions and loans amounting to tens of millions of dollars per year were required from Mel and Herb to keep the franchise afloat.

16. In 2007, concerned with the Pacers' negative image and continuing operating losses, Mel approached Herb about selling the Pacers. Herb was not interested in selling.

17. Mel did not possess a unilateral right to force a sale of the Pacers. In addition, Mel could not transfer his shares in MH Holdings to anyone other than his son David Simon without Herb's consent.

18. As an alternative to a sale of the Pacers, Mel and Herb began discussing the possibility of restructuring the Pacers' ownership.

19. During 2008 and 2009, Herb, Mel, accountants at Katz Sapper & Miller LLP (trusted advisors who represented Herb, Mel, and other Simon family interests for many years), and others were involved in extensive discussions with respect to restructuring the Pacers' ownership.

20. Their goal was to reach an equitable agreement whereby Mel would be relieved of the burden of funding ongoing losses while permitting Herb to continue to operate the Pacers.

21. Their goal was to reach an equitable agreement whereby Mel would be relieved of the burden of funding ongoing losses while permitting Herb to continue to operate the Pacers.

22. An initial restructuring agreement was reached in June of 2008. This agreement, however, was subject to NBA approval.

23. In the fall of 2008 and continuing into 2009, the world economy crashed. The equity markets were particularly impacted, with the S&P 500 Index and Dow Jones Industrial Average ending 2008 down 33.8% and 39.5% respectively for the year, their largest annual losses since the Great Depression. The economic decline continued through the spring of 2009. This economic timeframe, which became known as "the Great Recession," also had a dramatic negative impact on the value of the Pacers.

24. Because circumstances had drastically changed from those that existed in June 2008, Herb was unwilling to restructure the Pacers' ownership under the terms agreed to in June 2008. Herb thus insisted that he and Mel and their advisers begin renegotiating the terms of the restructuring agreement (which had not yet been approved by the NBA).

25. On February 2, 2009, Herb and Mel entered into several agreements (an agreement and undertaking, an amendment and restatement of the MH Holdings shareholder

agreement, and a conversion of Pacers Basketball Corporation to the Pacers Basketball, LLC) that reorganized the relationship between Herb and Mel as it related to the Pacers (collectively, the "Reorganization").

26. The Reorganization was the culmination of a lengthy negotiation process, in which partners in the firm of Katz Sapper & Miller LLP played a significant role. Additionally, Herb and Mel were savvy and experienced businessmen, both skilled in making business deals and interested in striking the best deal for themselves in the Reorganization.

27. Mel received substantial consideration under the Reorganization, including, without limitation, the termination of his continuing obligation to fund losses and answer mandatory capital calls, a release from personal guarantees, and a preference for proceeds upon any sale of the Pacers.

28. On or about October 14, 2010, Mel's estate[1] timely filed a 2009 United States Gift (and Generation-Skipping Transfer) Tax Return, Form 709 (the "**2009 Gift Tax Return**") with the Internal Revenue Service. In the 2009 Gift Tax Return, Mrs. Simon consented to have gifts made by Mel in 2009 to be considered as made one-half by each spouse.

29. The 2009 Gift Tax Return was audited by the Commissioner of Internal Revenue (the "**Commissioner**"). The Commissioner issued a notice of deficiency to Mrs. Simon dated December 10, 2013 asserting that Mel made an additional taxable gift in 2009 and Mrs. Simon was responsible for one-half of that gift, in the amount of $41,5000,000 (the "**Notice of Deficiency**"). The Commissioner's erroneous adjustment resulted in a gift tax deficiency of

---

[1] Mel passed away on September 16, 2009.

$18,6750,000.  A copy of the Notice of Deficiency is appended as **Attachment 1 to Exhibit A** and is incorporated by reference.

30. Ms. Simon paid, under protest, $21,372,328.43 of gift tax and interest on May 30, 2014 to the Commissioner.

31. As set forth more fully herein below, on or about July 18, 2014, Plaintiff timely mailed to the Internal Revenue Service a Form 843, Claim for Refund and Request for Abatement (the "**Claim for Refund**"), a true and correct copy of which is attached as **Exhibit A**. The amount of refund requested was $21,372,328.43, or such greater amount as is legally refundable, plus additional allowable interest.  Mrs. Simon disputed each allegation in the Notice of Deficiency.  The name of the taxpayer on Claim for Refund is Bren Simon, Donor.

32. On January 18, 2015, the Claim for Refund was deemed denied under 26 U.S.C. § 6532(a)(1).  Accordingly, this suit is timely commenced.  No further action on the Claim for Refund has been taken in any judicial proceeding, including any proceeding in the United States Tax Court.

33. As grounds for recovery of the amount claimed on the Claim for Refund, Plaintiff incorporates by reference the averments contained in the Claim for Refund.

34. Plaintiff is the legal and beneficial owner of the Claim for Refund and has not assigned or transferred it, or any part hereof.

## IV.   CLAIM FOR RELIEF
**(Gift made by Mel in 2009)**

35. Mrs. Simon incorporates by reference the averments in ¶¶ 1-34 above.

36. The Commissioner's explanation for his assessment of additional gift taxes with respect to Mrs. Simon in the Notice of Deficiency is as follows:

> In addition to the gifts reported by this donor, it is determined that an additional gift representing one-half of gifts made by this donor's spouse, Melvin Simon, are attributable to her pursuant to the election made on the 2009 filed Form 709 to treat all gifts as having been made one-half by the spouse. IRC Section 2513.

37. The notice of deficiency issued to Mel's estate ("**Mel's Notice of Deficiency**"), which is appended in relevant part as **Attachment 2 to Exhibit A** (with information not relevant to this case redacted), provides the Commissioner's explanation for his assessment of additional gift taxes and is as follows:

> It is determined that the conversion of Pacers Basketball Corporation to Pacers Basketball, LLC, in 2009 resulted in a taxable gift of $83,000,000.00. IRC Sections 2511, 2512.
>
> Alternatively, it is determined that the Melvin Simon Trust voting and liquidation rights lapsed upon conversion of Pacers Basketball Corporation to Pacers Basketball, LLC, and the lapse shall be treated as a transfer by gift pursuant to IRC Section 2704.

38. However, no gift occurred under 26 U.S.C. §§ 2511 and 2512 because (1) the Reorganization was made in the ordinary course of business, bona fide, and free of any donative intent as those terms are used in 26 C.F.R. § 25.2512-8 and (2) the rights exchanged by Mel and Herb in the Reorganization were for adequate and full consideration in money's worth as those terms are used in 26 C.F.R. § 25.2511-1(g)(1).

39. In addition, 26 U.S.C. § 2704 does not apply to the Reorganization because (1) the Reorganization was made in the ordinary course of business, bona fide, and free of any donative intent as those terms are used in 26 C.F.R. § 25.2512-8 and (2) no lapse of voting or liquidation rights occurred in the Reorganization.

40. Pleading in the alternative to ¶¶ 35-39 above, if any gift or lapse of voting or liquidation rights occurred as a result of the Reorganization, the amount of any gift under 26 U.S.C. §§ 2511 and 2512 or of any deemed transfer under 26 U.S.C. § 2704 is less than that alleged by the Commissioner in the Notice of Deficiency.

## V. PRAYER

WHEREFORE, Mrs. Simon respectfully requests judgment in its favor and against the United States in an amount of at least $21,372,328.43, or such other amount as may be legally refundable, plus interest as provided by law, and Mrs. Simon's costs and other further relief as the Court deems appropriate.

Respectfully submitted,

Dated: March 16, 2015

By: /s/ John W. Porter
John W. Porter
Keri D. Brown
Jeffrey D. Watters, Jr.
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995
(713) 229-1597
(713) 229-2797 (Fax)

COUNSEL FOR PLAINTIFF